IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

CODY TATE,

      Plaintiff,

v.

YRC WORLDWIDE, INC., d/b/a
YELLOW TRANSPORTATION, et al.,

      Defendants.

CIVIL ACTION FILE NO.
1:09-CV-177-CC-RGV

## MAGISTRATE JUDGE'S FINAL REPORT, RECOMMENDATION, AND ORDER

Plaintiff Cody Tate ("plaintiff"), proceeding *pro se*, brings this action against defendants YRC Worldwide, Inc. ("YRCW"), d/b/a Yellow Transportation,[1] Tower Cleaning Systems, Inc. d/b/a U.S. Maintenance ("U.S. Maintenance"), HLE, Inc. d/b/a Everklean ("Everklean"), and Lee Elrod ("Elrod"), alleging racial discrimination, hostile work environment, and retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. ("Title VII"), and

_____

[1] Although plaintiff has sued "YRC Worldwide, Inc. d/b/a Yellow Transportation," YRCW asserts that it has never done business as "Yellow Transportation." [Doc. 35-2 at 7 n.1]. Rather, Yellow Transportation, Inc. ("Yellow Transportation"), was a separate corporation from YRCW and its subsidiary, YRC, Inc. ("YRC"). [Id.; Doc. 35-3 ¶¶ 1-2]. In October 2008, Yellow Transportation was dissolved and its assets merged into YRC. [Doc. 35-3 ¶¶ 1-2; Doc. 35-4 (Mickler Decl.) ¶ 4]. YRCW asserts that all of plaintiff's allegations against YRCW are based on alleged conduct by then-Yellow Transportation employees. [Doc. 35-2 at 7 n.1]. The docket lists Yellow Transportation as a defendant in this action, but plaintiff's complaint does not name it as a defendant. Accordingly, the Clerk is **DIRECTED** to remove Yellow Transportation, Inc., as a defendant from the docket of this case.

42 U.S.C. § 1981 ("§ 1981"). [Doc. 1].[2] Defendant YRCW has filed a motion for summary judgment, [Doc. 35], which plaintiff opposes, [Doc. 39].[3] Additionally, plaintiff has not effected service of process on defendants U.S. Maintenance, Elrod, or Everklean, a sole proprietorship plaintiff claims is owned by Elrod. See [Doc. 1 ¶¶ 8-10, 38]. For the following reasons, the undersigned **RECOMMENDS** that YRCW's motion, [Doc. 35], be **GRANTED** in its entirety and that plaintiff's claims against defendants U.S. Maintenance, Everklean, and Elrod be **DISMISSED** for plaintiff's failure to effect service of process.

---

[2] Plaintiff originally filed this action in the United States District Court for the Eastern District of New York on January 2, 2008. See [Doc. 1]. The case was transferred to this Court on January 23, 2009, due to improper venue. [Docs. 20 & 21]. Plaintiff's former attorney, Aaron Woskoff, withdrew from representation while the case was pending in the Eastern District of New York. See [Docs. 2 & 3].

[3] YRCW filed its motion on August 7, 2009. [Doc. 35]. Plaintiff filed a response in opposition on September 3, 2009. [Doc. 39]. Therefore, his response is untimely. See Local R. 7.1B, N.D. Ga (pre-December 1, 2009). On August 12, 2009, the Clerk sent plaintiff a Notice to Respond to Summary Judgment Motion, [Doc. 37], but plaintiff states in his response that he had not received a copy of the motion as of August 17, 2009, and he believes that "service was not completed under Local Rules of Civil Procedure." [Doc. 39 at 4]. Plaintiff asserts that he contacted defense counsel and was told that a copy of the motion was "sent regular mail service and they had no way to track it," and since plaintiff claims that he did not receive a copy of the "complete" motion until August 19, 2009, he asks for "an appropriate time to respond." [Id. at 4-5]. Since plaintiff filed a response contemporaneously with his request for "time to respond" and YRCW has not objected to plaintiff's request or assertions, the Court will consider plaintiff's response, despite its untimeliness.

# I. FACTUAL AND PROCEDURAL BACKGROUND

## A. Facts Relating to YRCW's Motion for Summary Judgment

YRC, a subsidiary of defendant YRCW, is a transportation services provider and offers services across the United States through various operating companies. [Doc. 35-3 ¶ 1; Doc. 35-4 ¶¶ 1-2].[4] YRC does business under the name "Yellow Transportation" and currently operates a Yellow Transportation facility in Marietta, Georgia (the "Atlanta Facility"). [Doc. 35-3 ¶¶ 1-2; Doc. 35-4 ¶¶ 2-3]. Prior to October 2008, the Atlanta Facility was owned and operated by Yellow Transportation. [Doc. 35-3 ¶ 2; Doc. 35-4 ¶ 4].

---

[4] In connection with its motion and in accordance with Local Rule 56.1B(1), YRCW filed a statement of material facts as to which there is no genuine issue to be tried. See [Doc. 35-3]. Plaintiff was required to file a response under Local Rule 56.1B(2)(a), and although his memorandum includes a heading entitled plaintiff's "Responses to the Defendant YRC Worldwide/Yellow Statement of Facts and Material Facts," plaintiff did not respond to any of YRCW's facts. Instead, he appears to set forth his own statement of material facts that he contends are in dispute. [Doc. 39 at 6-8]. See Local R. 56.1B(2)(b), N.D. Ga. Because "Local Rule 56.1B(2)(a)(2) mandates that the court will deem the movant's facts admitted unless the respondent directly refutes the movant's facts with concise responses supported by specific citations to the evidence," the Court deems admitted all of YRCW's facts that are supported by citations to the record. Rampura, LLC v. Main and 75 Center, LLC, Civil Action No. 1:06-CV-515-CAP, 2008 WL 3861203, at *9 (N.D. Ga. Feb. 13, 2008). The Court also disregards plaintiff's statement of material facts, to which YRCW responded by objecting to each fact, [Doc. 41], because he failed to comply with Local Rule 56.1B(1), which requires each material fact to be "supported by a citation to evidence proving such fact." Local R. 56.1(B)(1), N.D. Ga. Plaintiff cites only his complaint and written summaries of recorded telephone conversations in fact statements 2 through 5, which are immaterial to the issues presented in YRCW's motion, and he fails altogether to cite evidence in support of his remaining facts.

In 2004, Yellow Transportation began using "Yellow Talent Acquisition Gateway," or "Y-TAG," an entirely online system for advertising job postings and receiving job applications. [Doc. 35-3 ¶ 3; Doc. 35-4 ¶ 5]. Using Y-TAG, an applicant could apply for any open position and could also create and post a profile and be automatically contacted via e-mail if a Yellow Transportation position that "matched" his profile became available. [Doc. 35-3 ¶ 8; Doc. 35-4 ¶ 10]. Beginning in 2004, all applicants for employment with Yellow Transportation, both internal and external, were required to apply online through Y-TAG. [Doc. 35-3 ¶ 4; Doc. 35-4 ¶ 6].

Beginning in 2004, each Yellow Transportation facility, including the Atlanta Facility, displayed a poster on the front door of its facility stating, "To Apply For Employment Or Find Out Information On Employment Opportunities At This Facility, Go On-Line Via The Internet At: www.myyellow.com/jobs." [Doc. 35-3 ¶ 5; Doc. 35-4 ¶ 7 & Ex. 1]. The poster also states, "No Applications Are Accepted On-Site At This Location." [Doc. 35-3 ¶ 5; Doc. 35-4 ¶ 7 & Ex. 1]. Similar posters were also displayed inside Yellow Transportation's facilities, including the Atlanta Facility, on various bulletin boards. [Doc. 35-3 ¶ 6; Doc. 35-4 ¶ 8 & Exs. 2-3]. Yellow Transportation's policy has always been that any manager approached by an applicant should direct the applicant to Y-TAG. [Doc. 35-3 ¶ 7; Doc. 35-4 ¶ 9].

Since at least 2004 to the present, the only dock worker or driver positions available to new applicants at the Atlanta Facility have been "casual" positions. [Doc. 35-3 ¶ 9; Doc. 35-4 ¶ 11]. "Casual" employees are part-time employees who are on-call twenty-four hours a day, seven days a week and who fill in for absent or vacationing regular, unionized employees or supplement the regular workforce when dictated by increased freight volume. [Doc. 35-3 ¶ 9; Doc. 35-4 ¶ 11; Doc. 35-5 (Barry Decl.) ¶ 2]. There are three casual positions: (1) Dock Worker; (2) Line Haul Driver (over-the-road); and (3) Combination Driver ("City" or local delivery drivers). [Doc. 35-3 ¶ 9; Doc. 35-4 ¶ 11]. Casual employees are eligible to be considered for "regular," full-time unionized positions as they become available. [Doc. 35-3 ¶ 9; Doc. 35-4 ¶ 11; Doc. 35-5 ¶ 2].

From January 2002 to April 2009, Yellow Transportation manager Ed Barry ("Barry") was primarily responsible for hiring casual employees at the Atlanta Facility. [Doc. 35-3 ¶ 11; Doc. 35-4 ¶ 13]. Beginning in 2004, Barry could only consider an applicant for a casual position if the applicant applied online through Y-TAG. [Doc. 35-3 ¶ 12; Doc. 35-5 ¶ 3]. In 2006 and 2007, 75 percent (52 out of 69) of the persons hired by Barry were African-American. [Doc. 35-3 ¶ 13; Doc. 35-4 ¶ 14 & Exs. 4-5].

Defendant Everklean, which was owned and operated by defendant Elrod, provided certain maintenance and janitorial services at the Atlanta Facility. [Doc. 35-3 ¶ 14; Doc. 35-5 ¶ 4]. Barry was the Atlanta Facility's primary contact with Everklean. [Doc. 35-3 ¶ 14; Doc. 35-5 ¶ 4]. Yellow Transportation managers, including Barry, had no authority to hire, issue instruction to, discipline, or control the day-to-day work performed by Everklean at the Atlanta Facility, as Elrod performed all of these functions. [Doc. 35-3 ¶ 15; Doc. 35-5 ¶ 5]. Barry communicated exclusively with Elrod, and the only situations in which Barry or other Yellow Transportation managers could request assistance from Everklean workers directly was if an urgent situation arose, such as a hazardous material spill, that needed to be dealt with immediately and Elrod was unavailable. [Doc. 35-3 ¶¶ 15-16; Doc. 35-5 ¶ 5].

In September 2005, plaintiff was informed by an Everklean employee that Elrod was looking for workers to perform maintenance services at the Atlanta Facility. [Doc. 35-3 ¶ 20; Doc. 38 (Tate Dep. Pt. 1) at 47]. Plaintiff met with Elrod and was retained as a "commercial contract cleaner supervisor." [Doc. 35-3 ¶ 21; Doc. 38 at 47-50, 57]. Plaintiff understood that he was retained by Everklean as an independent contractor rather than as an Everklean employee, and he took this

relationship to mean that "[b]asically [he] was in business for [himself]." [Doc. 35-3 ¶ 22; Doc. 38 at 50-51].

As an Everklean contractor, plaintiff was paid by Elrod with an Everklean check, and his work schedule was set by Elrod. [Doc. 35-3 ¶ 23; Doc. 38 at 59-60]. No one at Yellow Transportation instructed plaintiff on how his job was to be performed or interfered with his work, other than managers occasionally pulling aside plaintiff and other Everklean contractors from their cleaning routines to attend to spills. [Doc. 35-3 ¶ 24; Doc. 38 at 63-65]. While plaintiff was working as a contractor for Everklean, he came to believe, based on a conversation with a representative from defendant U.S. Maintenance, that Everklean's contract with U.S. Maintenance required Elrod to treat plaintiff and other Everklean contractors as employees.[5] [Doc. 35-3 ¶ 25; Doc. 38 at 65-67; Doc. 38-2 (Tate Dep. Pt. 2) at 52-53]. Plaintiff alleges that in December 2006, he told Barry that he believed that Elrod was required to classify him as an employee rather than as an independent contractor. [Doc. 35-3 ¶ 26; Doc. 38-2 at 54-55. However, Barry stated in response that he did

---

[5] U.S. Maintenance had a contract with YRCW to provide maintenance services at the Atlanta Facility and other locations, and YRCW "does not dispute [p]laintiff's belief and testimony that [Everklean] itself was a contractor to [U.S. Maintenance] or that [Everklean] was required to have employees (versus independent contractors) under the contract." [Doc. 35-2 at 26 n.9].

not have anything to do with plaintiff's employment relationship with Elrod. [Doc. 35-3 ¶ 27; Doc. 38-2 at 55].

On December 18, 2006, plaintiff inquired with Yellow Transportation manager John Walsh ("Walsh") about working for Yellow Transportation. [Doc. 35-3 ¶ 28; Doc. 38-2 at 28-29].[6] Plaintiff testified that Walsh told him that he would "love to have [plaintiff] aboard," but he thought there might be a verbal agreement between Elrod, Barry, and Yellow Transportation's Terminal Manager, Phil Hinkle ("Hinkle"), that Yellow Transportation could not hire plaintiff or other former Everklean employees until they had stopped working for Everklean for at least six months. [Doc. 35-3 ¶ 29; Doc. 38-2 at 28-30; Doc. 38-3 (Tate Dep. Pt. 3) at 4-5]. Since Walsh was not sure whether this verbal agreement actually existed, he suggested that plaintiff speak with Hinkle, whom plaintiff understood to be the highest ranking Yellow Transportation manager at the Atlanta Facility and one of the individuals who made hiring decisions. [Doc. 35-3 ¶ 30; Doc. 38-2 at 30, 34; Doc. 38-3 at 6-7, 16-17].

---

[6] In January 2005, plaintiff had applied online for a Yellow Transportation combination dock worker/driver position at the Atlanta Facility. [Doc. 35-3 ¶ 17; Doc. 38 at 41-45]. Plaintiff was not qualified for the position because it required a valid commercial driver's license, which plaintiff did not have. [Doc. 35-3 ¶ 18; Doc. 38 at 45-46]. Plaintiff's non-selection for this position is not at issue in the instant lawsuit. [Doc. 35-3 ¶ 19; Doc. 38 at 46-47].

Plaintiff then spoke with Hinkle, who informed him that there was no "verbal agreement" that would prevent him from being hired and that he was free to apply online for any open Yellow Transportation position, and that Hinkle would have to check with Barry to "see what [plaintiff] was being told." [Doc. 35-3 ¶ 31; Doc. 38-2 at 30-31]. Although plaintiff was aware of Yellow Transportation's online job posting and application process, plaintiff did not apply for any Yellow Transportation position after his conversation with Hinkle. [Doc. 35-3 ¶ 32; Doc. 38-2 at 29-30, 33-34; Doc. 38-3 at 6].[7] Plaintiff testified that he did not apply for a position in part because Elrod allegedly threatened to fire him if he applied for a position with Yellow Transportation, and that it would have been a "waste of time" to attempt to apply. [Doc. 35-3 ¶ 37; Doc. 38-2 at 33-34; Doc. 38-3 at 6].

On December 23, 2006, Elrod sent a letter on behalf of Everklean to Everklean contractors, including plaintiff, informing them that as of January 1, 2007, all Everklean contractors would become Everklean employees. [Doc. 35-3 ¶ 40; Doc. 38-2 at 66-67; Doc. 38-7 (12/23/06 memo) at 45]. Plaintiff received this letter and

---

[7] Plaintiff never looked to see which, if any, open positions existed at Yellow Transportation after speaking with Hinkle; he has no knowledge of whether there were, in fact, any open positions at the Atlanta Facility between December 2006 and January 2007; he has no knowledge of whether anyone was hired for any Yellow Transportation position at the Atlanta Facility between December 2006 and January 2007; and he is not aware of any Everklean employee being hired by Yellow Transportation at any time. [Doc. 35-3 ¶¶ 33-36; Doc. 38-3 at 6-7, 10-11, 36].

understood that he would be an Everklean employee as of January 1 if he remained with Everklean. [Doc. 35-3 ¶ 41; Doc. 38-2 at 67]. As part of the process of transitioning the Everklean contractors to employees, Elrod requested that plaintiff fill out an I-9 form on January 4, 2007, but plaintiff refused to fill it out because he believed it to be incorrect and "back dated," and he "didn't want to be an employee under [Elrod]." [Doc. 35-3 ¶¶ 42-43; Doc. 38 at 71, 75-76; Doc. 38-2 at 76].[8]

After plaintiff refused to sign the I-9 form, Elrod instructed him to take "some days off." [Doc. 35-3 ¶ 44; Doc. 38 at 71-72].[9] Plaintiff claims that after his confrontation with Elrod, he then went to see Barry about a job on January 4, and that Barry told him about the "six-month rule" under which plaintiff would have to wait for six months after leaving Everklean before he could be considered for employment by Yellow Transportation. [Doc. 35-3 ¶ 46; Doc. 38-2 at 79]. Barry nonetheless said he would check with Elrod about hiring plaintiff. [Doc. 35-3 ¶ 46; 38-2 at 78-79; Doc. 38-3 at 1].[10] However, on January 7, 2007, plaintiff left Georgia

---

[8] Plaintiff testified that the Georgia Department of Labor "or some other agency within the Georgia government" told Elrod he had to convert his independent contractors into employees. [Doc. 38 at 75].

[9] Plaintiff claims that Elrod also told him that "due to the fact that [he] didn't fill out the form that it eliminated [his] position." [Doc. 38 at 72].

[10] Barry avers that he never told plaintiff that he was ineligible to apply for a Yellow Transportation casual position until he had waited for six months, and Barry did not have any agreement with Elrod not to hire current or former Everklean

and moved to New York without further speaking with Barry or Elrod. [Doc. 35-3 ¶ 47; Doc. 38 at 73; Doc. 38-3 at 1]. Plaintiff never returned to Everklean after his January 4 meeting with Elrod, and he testified that at that point, he no longer wished to continue working for Elrod at Everklean. [Doc. 35-3 ¶¶ 44-45; Doc. 38 at 72, 76]. On July 24, 2007, plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") based on the allegation that he was denied a position at Yellow Transportation on January 4, 2007, because of his race. [Doc. 35-3 ¶ 49; Doc. 38-2 at 74-75; Doc. 38-9 (EEOC Charge)].[11]

Plaintiff also alleges that on an unknown date, while he was working at the Atlanta Facility, he heard a Yellow Transportation supervisor named "Ted" state to another individual that plaintiff was "running around like a crack head" while a spill on a dock needed to be cleaned up. [Doc. 35-3 ¶¶ 50-51; Doc. 1 ¶ 64; Doc. 38-3 at 36-40]. Plaintiff also claims that Ted referred to him as a "clean up guy" when asking him to clean up the spill. [Doc. 35-3 ¶ 51; Doc. 38-3 at 40].

---

representatives who had worked at the Atlanta Facility. [Doc. 35-3 ¶ 71; Doc. 35-5 ¶ 8].

[11] Plaintiff testified that January 4, 2007, was actually the date on which he was "terminated" from Everklean and that he had attempted to apply for a Yellow Transportation position "the whole time," and could not "give . . . an amount of time that [he] spoke with management about wanting to apply." [Doc. 38-2 at 76].

Plaintiff alleges that he and Ted subsequently "had words," that he told Ted he needed a mask to clean the spill, and that Ted told him to leave the dock. [Doc. 35-3 ¶ 52; Doc. 38-3 at 37-40]. Plaintiff told Ted that he "didn't work for him, [he] worked for [Elrod], and that if [Elrod] wanted [plaintiff] off the dock, [he] would get off the dock." [Doc. 35-3 ¶ 52; Doc. 38-3 at 37-38]. Plaintiff believes that Ted may have referred to him as "crack head" because plaintiff looked "rough" from working seven days a week for Everklean. [Doc. 35-3 ¶ 53; Doc. 38-3 at 42]. However, this was an isolated incident and plaintiff was not referred to as "crack head" again by Ted or anyone else. [Doc. 35-3 ¶ 54; Doc. 38-3 at 37].

Plaintiff also testified that a few other unspecified Yellow Transportation dock workers referred to him in a derogatory manner, but he cannot recall what was said. [Doc. 35-3 ¶ 55; Doc. 38-3 at 41-42]. Plaintiff "brushed off" these comments because "that's just them." [Doc. 35-3 ¶ 55; Doc. 38-3 at 42]. Plaintiff complained about the alleged "crack head" and "clean up guy" comments to Elrod, but he never complained to anyone at Yellow Transportation since Elrod allegedly "told [him] not to go to anyone," and plaintiff generally cannot recall complaining to anyone in Yellow Transportation management about conduct or speech by Yellow

Transportation employees that he found offensive or derogatory. [Doc. 35-3 ¶ 56; Doc. 38-3 at 41, 45-46].[12]

Plaintiff was never physically threatened by a Yellow Transportation employee, but his complaint alleges that he was retaliated against in violation of Title VII and § 1981 in the form of a "locker search" for purportedly complaining about being addressed in a derogatory manner. [Doc. 35-3 ¶¶ 57-58; Doc. 1 ¶ 65; Doc. 38-3 at 47-54, 56].[13] The "locker" is actually a Yellow Transportation office in which Everklean stored cleaning supplies and posted its work schedule, and in which Everklean employees/contractors could store personal belongings. [Doc. 35-3 ¶¶ 60-61; Doc. 38-3 at 48-50]. Plaintiff testified that, at some point, freight disappeared from the Atlanta Facility's dock, and Yellow Transportation security personnel searched for the missing freight. [Doc. 35-3 ¶ 62; Doc. 38-3 at 43-48]. As part of this search, a Yellow Transportation security guard asked plaintiff for his key to the room used by Everklean to store supplies in order to search for the missing

---

[12] However, in response to the question of whether plaintiff ever complained to anyone in Yellow Transportation management about conduct or speech that he found offensive or derogatory, plaintiff testified that he complained about being given "[c]onflicting reports" regarding whether there was a "verbal agreement" about hiring him. [Doc. 38-3 at 43, 46].

[13] Plaintiff claims that his former attorney drafted this allegation and that plaintiff explained to his attorney that the alleged derogatory comments and locker search were "two separate incidents." [Doc. 35-3 ¶ 59; Doc. 38-3 at 47-48].

freight, and plaintiff gave him his key. [Doc. 35-3 ¶ 63; Doc. 38-3 at 43-44, 48-49]. Plaintiff later went to the office and discovered that the security guard had searched his bag containing "personal belongings," such as his CD player, phone, and food, noting that the items were rearranged from how he remembered them. [Doc. 35-3 ¶ 64; Doc. 38-3 at 50-51].

Plaintiff informed Elrod about the search, but he took no further action after Elrod allegedly told him to "leave it alone." [Doc. 35-3 ¶ 67; Doc. 38-3 at 51-52]. Plaintiff does not know if Elrod's belongings or those of any other Everklean employees were searched, but he explained that he was the only person working during that shift. [Doc. 35-3 ¶ 65; Doc. 38-3 at 53]. Plaintiff does not know why the security guard looked through his belongings other than to search for missing freight, [Doc. 35-3 ¶ 66; Doc. 38-3 at 48-49], but he claims that he did not "touch freight" while he was working and did not "do anything on the dock," and therefore did not understand why his property was searched, [Doc. 38-3 at 48-49].

Plaintiff also testified that Yellow Transportation discriminated against him on the basis of race in that should have "seen that [Elrod] was supposed to have employees and not independent contractors," and "remedied the situation." [Doc. 35-3 ¶ 68; Doc. 38-4 (Tate Dep. Pt. 4) at 9-10]. Plaintiff claims that as an African-American, he was not treated as an employee by Everklean and that "all African-

American employees under [Elrod] felt that way." [Doc. 35-3 ¶ 68; Doc. 38-4 at 13, 22-23]. However, while plaintiff contracted for Everklean, there was at least one white male who also acted as an independent contractor for Everklean. [Doc. 35-3 ¶ 69; Doc. 38-4 at 24]. Plaintiff "feels" he was discriminated against by Yellow Transportation, but he cannot identify any white persons who he believes were treated differently from him. [Doc. 35-3 ¶ 70; Doc. 38-3 at 18-19].

**B.      Facts Relating to Service of Process**

The record reflects that plaintiff has yet to effect service of process on defendants U.S. Maintenance, Everklean, and Elrod. Plaintiff sent waiver of service forms to defendants YRCW, Everklean/Elrod, and U.S. Maintenance on July 30, 2008, and he described his efforts to serve the defendants in his July 30, 2008, and September 8, 2008, letters to U.S. Magistrate Judge Marilyn D. Go of the United States District Court for the Eastern District of New York. See [Doc. 6 (7/30/08 letter) at 1; Doc. 6 (waiver of service forms) at 8-10; Doc. 8 (9/8/08 letter)]. On August 18, 2008, YRCW executed a waiver of service form, but the other defendants did not. See [Doc. 7 (YRCW waiver); Doc. 8]. Therefore, plaintiff was required to effect service of process pursuant to the Federal Rules of Civil Procedure on the remaining defendants. See [Doc. 10 (Magistrate Judge Go order) at 2-3].

In two additional letters to Magistrate Judge Go dated September 30, 2008, plaintiff requested additional time in which to properly serve U.S. Maintenance, stated that defendant Elrod had received and signed "confirmation for the waiver" of service but that plaintiff was unclear whether Elrod was properly served, and sought the advice of the court on how to proceed. [Docs. 13 & 14 (9/30/08 letters)]. On November 13, 2008, a status conference was held before Magistrate Judge Go, at which plaintiff and counsel for defendant YRCW appeared. See [Docket entry 11/13/08]. At that conference, the parties discussed defendant's motion to dismiss for improper venue,[14] and plaintiff consented to a transfer of venue to the United States District Court for the Northern District of Georgia in lieu of dismissal. [Id.] It was determined that if the district judge ordered that the action be transferred, YRCW's time to answer or otherwise respond to the complaint was extended to 30 days after receipt of the file by this Court. Plaintiff was also given until December 19, 2008, to serve Everklean and Elrod. [Id.].

Plaintiff subsequently sent a letter to Magistrate Judge Go dated December 29, 2008, informing her that he had obtained an attorney in the Northern District of Georgia, and he requested a 20-day extension after the case was transferred to this

_____

[14] The motion itself indicates that it was filed by Yellow Transportation, Inc., but the docket reflects that the motion was filed by YRCW. See [Doc. 11 & 9/26/08 Docket entry]. As noted earlier, Yellow Transportation, Inc., is not named as a defendant in this action.

Court in which to personally serve the remaining defendants. [Doc. 19].[15] No order was issued in response to that request. However, on January 22, 2009, United States District Judge Eric N. Vitaliano ordered that the case be transferred and directed plaintiff to "serve defendants in the manner prescribed by the Federal Rules of Civil Procedure and the local rules of the Northern District of Georgia upon transfer of the action to that district." [Doc. 20 at 6]. The record reflects that plaintiff has not effectuated service of process on U.S. Maintenance, Elrod, or Everklean.

## II. <u>DISCUSSION</u>

**A.    YRCW's Motion for Summary Judgment, [Doc. 35]**

### 1.    *Standard of Review*

When ruling on a motion for summary judgment, the Court must view the evidence and draw all factual inferences in the light most favorable to the non-moving party. <u>Frederick v. Sprint/United Mgmt. Co.</u>, 246 F.3d 1305, 1309 (11th Cir. 2001); <u>Hairston v. Gainesville Sun Publ'g Co.</u>, 9 F.3d 913, 918 (11th Cir. 1993). Summary judgment is appropriate if "the pleadings, the discovery and disclosure

---

[15] After the case was transferred to this Court, plaintiff sent two letters to the undersigned complaining about communications between his former attorney and counsel for defendant and about aspects of his own deposition. Plaintiff did not seek an extension of time to serve the remaining defendants, nor did he request any other relief in these letters. Accordingly, consistent with Local Rule 7.4, N.D. Ga., the Court has taken no action based on the letters, but they will be filed on the docket to complete the record of plaintiff's correspondence with the Court.

materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The party moving for summary judgment bears the initial burden of demonstrating the absence of any genuine issue of material fact, upon which the non-moving party must then submit specific facts showing a genuine issue for trial. Fed. R. Civ. P. 56(e); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial[,]" summary judgment should be granted. Celotex Corp., 477 U.S. at 322. "Speculation does not create a *genuine* issue of fact." Howard v. Or. Television, Inc., 276 Fed. App. 940, 941 (11th Cir. 2008) (unpublished) (citation and internal marks omitted) (emphasis in original). See also Goodman v. Ga. Sw., 147 Fed. App. 888, 891 (11th Cir. 2005) (unpublished) ("[A]ll reasonable inferences arising from the undisputed facts should be made in favor of the nonmovant, but an inference based on speculation and conjecture is not reasonable.") (citation and internal marks omitted).

## 2. *Deficiencies in Plaintiff's Response*

As noted earlier, plaintiff has failed to comply with Local Rules 56.1B(1) and 56.1B(2)(a)(2), as he has not responded to YRCW's statement of material facts and included his own statement of facts that were largely unsupported by specific

citations to record evidence. In addition, plaintiff's response to YRCW's motion fails to comply with Federal Rule of Civil Procedure 56(e)(2), which provides:

> When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must–by affidavits or as otherwise provided in this rule–set out specific facts showing a genuine issue for trial. If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party.

Fed. R. Civ. P. 56(e). In his response, plaintiff recites facts and makes conclusory assertions and arguments without including supporting citations to evidence, except for isolated references to Yellow Transportation's EEOC policy statement, a copy of the contract between U.S. Maintenance and Everklean, a copy of the I-9 form Elrod allegedly asked plaintiff to complete, the letter from Elrod indicating that Everklean contractors were to become employees effective January 1, 2007, plaintiff's tax forms, and written summaries of telephone conversations plaintiff had with Elrod, several Yellow Transportation employees, and his former attorney. See [Doc. 39 at 9 ¶ 1, & 11 ¶ 2]. However, none of the cited exhibits assist plaintiff with his Title VII or § 1981 employment discrimination claims against YRCW,[16] and plaintiff has thus

---

[16] Both Title VII and § 1981 use the same analysis for employment discrimination claims. See Standard v. A.B.E.L. Servs., Inc., 161 F.3d 1318, 1330 (11th Cir. 1998) ("Both of these statutes have the same requirements of proof and use the same analytical framework.").

failed to introduce evidence showing that there are any genuine issues of material fact on these claims.

Plaintiff's failure to meet his obligations under Rule 56(e) by citing specific evidence which presents genuine issues for trial is grounds for granting summary judgment on plaintiff's claims against YRCW. See Dickerson v. Donald, 252 Fed. App. 277, 280 (11th Cir. 2007) (*per curiam*) (unpublished) (affirming grant of summary judgment on claims where plaintiff failed "to present any evidence, either in support of his claims or to dispute, in any *material* way, the evidence submitted by the defendants in support of summary judgment"); Brown v. Parker Hannifin Corp., No. CIVA98-616CIV-ORL18C, 1999 WL 1449761, at *7 (M.D. Fla. Oct. 13, 1999) (where plaintiff "failed to cite specific record evidence from which the Court can conclude that each prima facie element [of his discriminatory failure to promote claim] has been satisfied," defendant was "entitled to summary judgment on this ground alone"). See also Douglas v. DeKalb County, Ga., Civil Action No. 1:06-CV-0584-TWT, 2007 WL 4373970, at *6 (N.D. Ga. Dec. 11, 2007) ("[I]t should be noted that [plaintiff's] allegations are confusing and particularly difficult to follow as the Brief fails to consistently cite to record evidence when making factual claims.") (citation omitted)). Moreover, "[g]iven that [YRCW's] factual statements are deemed admitted, the undisputed, material facts, discussed below, show that entry

of summary judgment is appropriate." <u>Brandon v. Lockheed Martin Aeronautical Sys.</u>, 393 F. Supp. 2d 1341, 1348 (N.D. Ga. 2005).

Accordingly, the undersigned **RECOMMENDS GRANTING** YRCW's motion for summary judgment due to plaintiff's failure to file a response in compliance with Rule 56 and the Local Rules of this Court. Moreover, despite the deficiencies in plaintiff's response, the undersigned will address his claims against YRCW, and for the following reasons, also **RECOMMENDS GRANTING** YRCW's motion for summary judgment on the merits.

**3.** *YRCW's Summary Judgment Motion*

**a.** **Title VII "Employer" Analysis**

As an initial matter, YRCW claims that plaintiff's Title VII and § 1981 claims, other than his failure to hire claims, fail because Yellow Transportation was not plaintiff's "employer," evidenced by plaintiff's admission that he was never employed by Yellow Transportation, but rather worked for Everklean as an independent contractor performing maintenance services at the Atlanta Facility. [Doc. 35-2 at 8; <u>see</u> Doc. 35-3 ¶¶ 21-22]. YRCW argues that Yellow Transportation managers had no authority to hire, issue instructions to, discipline, or control the day-to-day work performed by Everklean at the Atlanta Facility, and that defendant Elrod controlled all of these functions. [Doc. 35-2 at 8]. Plaintiff makes no argument

as to whether YRCW was his "employer," instead asserting only that "[a]ll allegations against [Elrod] were reported to [Barry] and other members of Yellow (YRCW) Atlanta terminal management in an attempt to help the plaintiff adjust his status of employment," and that "[i]n allowing [Elrod] to willingly create a hostile work environment (discrimination, threatening employees for talking to Atlanta local management about discrimination or obtaining employment from Yellow (YRCW), working employees/contractors 7 days a week and deceiving the knowledge of African-American employees/contractor with Atlanta terminal management having knowledge violates EEOC policy and the plaintiff's rights under Title VII [sic]." [Doc. 39 at 9-10 ¶¶ 4-5].

Title VII makes it unlawful for a covered employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Section 1981 provides, in pertinent part, that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a). "The broad anti-discrimination principles set forth by these statutes encompass situations in which an employer intentionally discriminates against an individual on the basis of that individual's race, whether

by terminating their employment, or by allowing them to be subjected to a racially-hostile working environment." Moore v. Jimmy Dean/Sara Lee Foods, Inc., 520 F. Supp. 2d 1359, 1365 (N.D. Ala. 2007) (citing 42 U.S.C. § 1981(b)) (emphasis omitted) (citations omitted). "Generally, such claims [under both statutes] are brought against the plaintiff's employer." Id.

"For Title VII purposes . . . an employer must be an individual or entity who extends a certain degree of control over the plaintiff." Crosby v. Mobile County, Civil Action No. 04-0144-CG-M, 2005 WL 6133115, at *8 (S.D. Ala. Sept. 15, 2005), vacated on other grounds by Crosby v. Mobile County Pers. Bd., No. 05-17039, 2007 WL 245126, at *4-5 (11th Cir. Jan. 30, 2007) (per curiam) (unpublished) (citation omitted). "In considering whether an entity is an individual's employer, [courts] consider: (1) whether or not the employment took place on the premises of the alleged employer; (2) how much control the alleged employer exerted on the employees; and (3) whether or not the alleged employer had the power to fire, hire, or modify the employment condition of the employees." Morrison v. Magic Carpet Aviation, 383 F.3d 1253, 1255 (11th Cir. 2004) (citing Welch v. Laney, 57 F.3d 1004, 1011 (11th Cir.1995)) (citation omitted). Thus, the analysis of whether a plaintiff was an "employee" under Title VII "should take into account the economic realities of the situation," when "viewed in light of the common law principles of agency and

the right of the employer to control the employee." Cobb v. Sun Papers, Inc., 673 F.2d 337, 341 (11th Cir. 1982). See Crosby, 2005 WL 6133115, at *8 ("A determination of whether a defendant is an 'employer' subject to liability under Title VII requires an examination of defendant's role with respect to the right to hire, fire, transfer, promote, discipline, set the terms, conditions and privileges of employment, train and pay the plaintiff.") (citations omitted).

The record demonstrates that neither YRCW nor Yellow Transportation was plaintiff's "employer." Plaintiff admits that he was retained by Everklean as an independent contractor, and he took this relationship to mean that "[b]asically [he] was in business for [himself]." [Doc. 35-3 ¶¶ 21-22; Doc. 38 at 50-51]. Plaintiff was paid by Elrod with an Everklean check, and his work schedule was set by Elrod. [Doc. 35-3 ¶ 23; Doc. 38 at 59-60]. Although plaintiff worked at one of Yellow Transportation's facilities in Marietta, no one at Yellow Transportation instructed plaintiff on how his job was to be performed. [Doc. 35-3 ¶ 24; Doc. 38 at 63-65]. Plaintiff does not dispute that Yellow Transportation managers had no authority to hire, issue instructions to, discipline, or control the day-to-day tasks performed by Everklean workers at the Atlanta Facility, aside from occasionally pulling contractors aside to clean up spills, as Elrod performed all of these functions. [Doc. 35-3 ¶¶ 15, 24; Doc. 35-5 ¶ 5; Doc. 38 at 63-65]. Barry, Yellow Transportation's

primary contact with Everklean, communicated almost exclusively with Elrod, except in emergency situations when Elrod was not available. [Doc. 35-3 ¶¶ 15-16; Doc. 35-5 ¶ 5]. The "economic realities" of plaintiff's employment situation indicate that neither YRCW nor Yellow Transportation was his employer.

Plaintiff vaguely asserts that "[a]ll allegations against [Elrod] were reported to [Barry] and other members of Yellow (YRCW) Atlanta terminal management in an attempt to help the plaintiff adjust his status of employment," and that YRCW/Yellow Transportation "allow[ed] [Elrod] to willingly create a hostile work environment (discrimination, threatening employees for talking to Atlanta local management about discrimination or obtaining employment from Yellow (YRCW), working employees/contractors 7 days a week and deceiving the knowledge of African-American employees/contractor with Atlanta terminal management having knowledge," which "violates EEOC policy and the plaintiff's rights under [Title VII]." [Doc. 39 at 9-10 ¶¶ 4-5]. However, these unsupported assertions do not demonstrate that YRCW or Yellow Transportation exercised any control "with respect to the right to hire, fire, transfer, promote, discipline, set the terms, conditions and privileges of employment, train and pay [plaintiff]," such that YRCW could be considered his employer. Crosby, 2005 WL 6133115, at *8; see Morrison, 383 F.3d at 1255.

While the evidence establishes that plaintiff was not employed by YRCW or Yellow Transportation, this does not necessarily preclude plaintiff's claims under Title VII or § 1981. "[A] plaintiff may bring a Title VII and/or § 1981 claim against an entity with which [he] had no direct employment relationship, so long as that entity had the ability to impact the terms and conditions of plaintiff's employment with her actual employer." Moore, 520 F. Supp. 2d at 1365 (citing Zaklama v. Mt. Sinai Med. Ctr., 842 F.2d 291, 294 (11th Cir. 1988)). In Zaklama, the Eleventh Circuit held that a plaintiff could bring discriminatory discharge claims under both Title VII and § 1981 against a non-employer who submitted adverse performance evaluations to his employer, which directly resulted in the plaintiff's termination. 842 F.2d at 294-95. The court noted that it is "clear from the language of the statute that Congress intended that the rights and obligations it created under Title VII would extend beyond the immediate employer-employee relationship." Id. at 294. Thus, "Title VII protects a situation in which a defendant controls, and has discriminatorily interfered with, an individual's employment relationship with a third party." Clark v. Marietta Surgical Ctr., Inc., No. 1:97-CV-0790-JOF, 1999 WL 1043772 (N.D. Ga. Mar. 18, 1999).

However, the Court does not find this to be a situation in which a non-employer "control[[ed], and . . . . discriminatorily interfered with, [plaintiff's] employment relationship with a third party." As previously discussed, plaintiff

testified that he was "in business for [himself]," [Doc. 35-3 ¶¶ 21-22; Doc. 35-6 at 50-51], and there is no dispute that Yellow Transportation did not have the authority to hire, issue instructions to, discipline, or control his day-to-day work or the work performed by other Everklean contractors, [Doc. 35-3 ¶¶ 15, 24; Doc. 35-5 ¶ 5; Doc. 38 at 63-65]. Yellow Transportation did not interfere with Elrod's control over these aspects of plaintiff's work environment, and there is no evidence that it influenced or coerced Elrod into taking any negative employment actions against plaintiff. See Clark, 1999 WL 1043772.

Furthermore, even if YRCW "had the ability to impact the terms and conditions of plaintiff's employment with [his] actual employer," Moore, 520 F. Supp. 2d at 1365, under Title VII, plaintiff must still establish that he was an *employee* of a third party, in this case, Everklean. See Dilip Mehta, M.D. v. HCA Health Servs. of Fla., Inc., No. 8:05-CV-27-T24-TGW, 2006 WL 3133327, at *5 (M.D. Fla. Oct. 31, 2006). While there might be an issue as to whether plaintiff was truly an independent contractor or was, in reality, Everklean's employee,[17] the Court need

---

[17] Plaintiff testified that in December 2006, he told Barry that he believed that Elrod was required to classify him as an employee rather than as an independent contractor, [Doc. 35-3 ¶ 26; Doc. 38-2 at 54-55], and on December 23, Elrod sent a letter to all Everklean contractors, including plaintiff, informing them that as of January 1, 2007, they would, in fact, become Everklean employees, [Doc. 35-3 ¶ 40; Doc. 38-2 at 66-67; Doc. 38-7 at 45]. YRCW does not dispute plaintiff's belief and testimony that Everklean "was required to have employees (versus independent contractors)" under its contract with U.S. Maintenance, [Doc. 35-2 at 26 n.9], and, indeed, plaintiff attached to his response a copy of the contract indicating that U.S.

not address this, since even if plaintiff could be characterized as an Everklean employee, there is no evidence that YRCW "had the ability to impact the terms and conditions of plaintiff's employment with [his] actual employer." Moore, 520 F. Supp. 2d at 1365. Plaintiff has not refuted any of YRCW's statements of facts concerning its status with respect to plaintiff's employment, all of which support the conclusion that neither YRCW nor Yellow Transportation was plaintiff's employer and had no control over plaintiff's relationship with Everklean.[18] Thus, summary judgment is due to be granted on all of plaintiff's Title VII claims against YRCW, other than his failure to hire claim, based on the fact that YRCW was not plaintiff's

---

Maintenance's subcontractors were required to treat independent contractors as employees, [Doc. 39 at 38 (stating that "[a]ll persons who perform the services under [U.S. Maintenance's subcontractor agreement] must be your employees, and not your independent contractors.")].

[18] The Court notes that even if plaintiff was not an employee but was merely an independent contractor, "a defendant who is not the plaintiff's employer may be held liable under § 1981 for interference with the plaintiff's contractual rights with third parties." Martinez v. Pavex Corp., No. 8:03-CV-1197-T-27, 2006 WL 1823430, at *4 (M.D. Fla. June 30, 2006) (quoting Zaklama, 842 F.2d at 294-95 ("holding § 1981 is broad enough to include situations where the parties do not 'occupy a direct employment relationship'")). However, for the reasons discussed herein, including the fact that when plaintiff told Barry that Elrod should have treated plaintiff as an employee and not as an independent contractor, Barry's response was that he did not have anything to do with plaintiff's employment relationship, [Doc. 35-3 ¶ 27; Doc. 38-2 at 55], plaintiff has failed to demonstrate that Yellow Transportation interfered, discriminatorily or otherwise, with plaintiff's contractual relationship with Everklean or any other third party. See Gad-Tadros v. Bessemer Venture Partners, 326 F. Supp. 2d 417, 425 (E.D.N.Y. 2004) ("A plaintiff seeking to impose individual liability under Section 1981 must demonstrate some affirmative link to employment discrimination under § 1981.") (internal marks and citation omitted).

employer and had no control over plaintiff's employment relationship with Everklean.  Moreover, the Court finds that summary judgment is due to be granted on plaintiff's Title VII and § 1981 claims for the following additional reasons.

### b.    Plaintiff's Discriminatory Failure to Hire Claims

Plaintiff alleges that he "approached managers of [Yellow Transportation's Atlanta Facility] on multiple occasions for a position of employment," but that the managers refused to hire him or consider him for employment; that the "procedure plaintiff was compelled to follow in securing employment was unlike that of other prospective employees who were not African American in that non-African Americans were able to approach Yellow personnel for positions of employment and were able to receive same," and that the "only African American maintenance employees at the facility were hired by [Everklean] and that [Yellow Transportation] would only consider[] hiring non-African American employees."  [Doc. 1 ¶¶ 60-63].

YRCW argues that plaintiff's Title VII and § 1981 failure to hire claims fail because plaintiff did not apply for a position at Yellow Transportation, he is not aware of whether positions were even available, he cannot identify a lesser or equally qualified white applicant hired instead of him, and he cannot establish that Yellow Transportation's decision was pretextual.  [Doc. 35-2 at 20-24].  In his response, plaintiff makes the unsupported assertion that he was "denied a very valuable employment opportunity due to the preferential treatment of [Elrod] (non-

African American) by the defendant(s) Yellow (YRCW) terminal local management."
[Doc. 39 at 7 ¶ 9].

### i.    Direct and Circumstantial Evidence

A plaintiff in a Title VII action may attempt to show discrimination by offering either direct or circumstantial evidence. <u>Wilson v. B/E Aerospace, Inc.</u>, 376 F.3d 1079, 1085 (11th Cir. 2004). Direct evidence is evidence that, if believed, would prove the existence of a fact without inference or presumption. <u>Burrell v. Bd. of Trustees of Ga. Military Coll.</u>, 125 F.3d 1390, 1393 (11th Cir. 1997) (citation omitted); <u>Earley v. Champion Int'l Corp.</u>, 907 F.2d 1077, 1081 (11th Cir. 1990) (citation and emphasis omitted); <u>Rollins v. TechSouth, Inc.</u>, 833 F.2d 1525, 1528 n.6 (11th Cir. 1987).

Here, plaintiff does not claim to have presented direct evidence of discrimination. Thus, his claim must be based on circumstantial evidence and is examined under the burden-shifting framework set forth in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802-04 (1973). <u>Burke-Fowler v. Orange County, Fla.</u>, 447 F.3d 1319, 1323 (11th Cir. 2006) (*per curiam*). Under this framework, a plaintiff must first present a *prima facie* case of discrimination, and if successful, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for its actions. <u>Wilson</u>, 376 F.3d at 1087; <u>Pennington v. City of Huntsville, Ala.</u>, 261 F.3d 1262, 1266 (11th Cir. 2001). Upon discharge of the defendant's burden, any

presumption of discrimination is rebutted, and the burden of production shifts to the plaintiff to offer evidence that the alleged reason of the defendant is a pretext for illegal discrimination. <u>Wilson</u>, 376 F.3d at 1087; <u>Combs v. Plantation Patterns</u>, 106 F.3d 1519, 1538-39, 1543 (11th Cir. 1997); <u>St. Mary's Honor Ctr. v. Hicks</u>, 509 U.S. 502, 508 (1993) (<u>quoting</u> <u>Tex. Dep't of Cmty. Affairs v. Burdine</u>, 450 U.S. 248, 256 (1981)).

### ii. *Prima Facie* **Case**

A plaintiff establishes a *prima facie* case of discriminatory failure to hire by demonstrating that (1) he is a member of a protected class; (2) he was qualified for and applied for a position the employer was seeking to fill; (3) despite his qualifications, he was rejected; and (4) equally or less qualified individuals outside the plaintiff's protected class were considered or hired for the position. <u>Underwood v. Perry County Comm'n</u>, 431 F.3d 788, 794 (11th Cir. 2005) (*per curiam*); <u>see</u> <u>Rice-Lamar v. City of Fort Lauderdale, Fla.</u>, 232 F.3d 836, 842-43 (11th Cir. 2000). "Demonstrating a prima facie case is not onerous; it requires only that the plaintiff establish facts adequate to permit an inference of discrimination." <u>Holifield v. Reno</u>, 115 F.3d 1555, 1562 (11th Cir. 1997). <u>See also</u> <u>Burdine</u>, 450 U.S. at 253-54. However, plaintiff has failed to prevent any evidence that would establish a *prima facie* case of discriminatory failure to hire.

Although plaintiff, who is African-American, is undoubtedly a member of a protected class, YRCW argues that plaintiff did not apply for a position at Yellow

Transportation and is not aware of whether positions were even available. [Doc. 35-2 at 21]. "If an employer uses formal procedures to announce positions and identify candidates, the plaintiff cannot make out a prima facie case unless he shows that he applied for the position." Jones v. Ala. Power Co., 282 Fed. App. 780, 785 (11th Cir. 2008) (*per curiam*) (unpublished) (citing Vessels v. Atlanta Indep. Sch. Sys., 408 F.3d 763, 768 (11th Cir. 2005)). "Furthermore, under such circumstances, '[a] general interest in being rehired without submitting an application' is insufficient to satisfy the application requirement." Id. (quoting Smith v. J. Smith Lanier & Co., 352 F.3d 1342, 1345 (11th Cir. 2003) (*per curiam*) (plaintiff failed to state *prima facie* case of failure to hire where plaintiff only expressed general interest in publicized position and did not actually apply)). The plaintiff must also show that the job he applied for was available at the time of application. Davis v. Valley Hospitality Servs., LLC, 211 Fed. App. 841, 843 (11th Cir. 2006) (*per curiam*) (unpublished).

In 2004, Yellow Transportation began using the "Y-TAG" online system for advertising all job postings and receiving applications. [Doc. 35-3 ¶ 3; Doc. 35-4 ¶ 5]. Upon the adoption of the Y-TAG system, all applicants for employment, both internal and external, were required to apply online through Y-TAG. [Doc. 35-3 ¶ 4; Doc. 35-4 ¶ 6]. Beginning in 2004, each Yellow Transportation facility, including the Atlanta Facility, displayed posters advising employees and applicants about the online application requirement and how to apply for positions online, and

informing employees that no applications would be accepted onsite. [Doc. 35-3 ¶¶ 5-6; Doc. 35-4 ¶¶ 7-8 & Exs. 1-3]. Plaintiff does not dispute that Yellow Transportation's policy has always been that any manager approached by an applicant should direct the applicant to Y-TAG, and plaintiff himself was aware of the process, having unsuccessfully applied for a position through Y-TAG in January 2005. [Doc. 35-3 ¶¶ 7, 17-19; Doc. 35-4 ¶ 9; Doc. 38 at 41-46].

Despite plaintiff's knowledge of Yellow Transportation's online application procedure, on December 18, 2006, he spoke directly with manager Walsh about working for Yellow Transportation. [Doc. 35-3 ¶ 28; Doc. 38-2 at 28-29]. Plaintiff alleges that Walsh told him that he would "love to have [plaintiff] aboard," but he thought there might be a verbal agreement between Elrod, Barry, and terminal manager Hinkle that Yellow Transportation could not hire plaintiff or other former Everklean employees until they had stopped working for Everklean for at least six months. [Doc. 35-3 ¶ 29; Doc. 38-2 at 28-30; Doc. 38-3 at 4-5]. Since Walsh was not sure whether this alleged verbal agreement actually existed, he suggested that plaintiff speak with Hinkle. [Doc. 35-3 ¶ 30; Doc. 38-2 at 30, 34; Doc. 38-3 at 6-7, 16-17]. Hinkle allegedly told plaintiff that there was no "verbal agreement" that would prevent plaintiff from being hired and that he was free to apply online for any open position, and Hinkle stated he would have to check with Barry to "see what [plaintiff] was being told." [Doc. 35-3 ¶ 31; Doc. 38-2 at 30-31].

Plaintiff did not apply online for any Yellow Transportation position after this conversation. Although plaintiff testified that he approached Barry on January 4, 2007, after his final falling out with Elrod and "termination" for refusing to sign an I-9 form, and Barry informed plaintiff he would have to wait six months, Barry also allegedly told plaintiff that he would talk with Elrod about hiring him. [Doc. 35-3 ¶ 46; Doc. 38-2 at 78-79; Doc. 38-3 at 1]. However, plaintiff left the Atlanta Facility, never checked back with Barry or Elrod, and moved to New York three days later, claiming that he no longer wished to continue working for Elrod at Everklean. [Doc. 35-3 ¶¶ 42-44, 46-47; Doc. 38 at 72, 76].

Plaintiff has failed to satisfy the second prong of a *prima facie* case because he never made any attempt to apply online for an open position through Y-TAG, as required of all internal and external job applicants, nor did he look to see whether there were any open positions after speaking with Hinkle. See [Doc. 35-2 at 23-24]. Plaintiff has no knowledge of whether there were, in fact, any open positions at the Atlanta Facility between December 2006 and January 2007, and he has no knowledge of whether anyone was hired for any Yellow Transportation positions at the Atlanta Facility between December 2006 and January 2007. [Doc. 35-3 ¶¶ 33-36; Doc. 38-3 at 6-7, 10-11, 36]. Although plaintiff claims that he was told by several managers that he would have to wait six months after leaving Everklean before he could apply for a Yellow Transportation position, he also testified that Hinkle told him there was

no such "verbal agreement" and that Barry told him he would check with Elrod about whether plaintiff could apply for a position.[19]  However, plaintiff made no attempts to follow up with any of the managers or to actually apply online.[20]  Under these circumstances, plaintiff has failed to create a genuine issue of material fact regarding whether he applied for an open position with Yellow Transportation.  See Jones, 282 Fed. App. at 785; Davis, 211 Fed. App. at 843; Underwood, 431 F.3d at 794.

Because plaintiff has failed to satisfy the second element of a *prima facie* case, he likewise cannot show that he was rejected for an open position for which he applied and that it was filled by a lesser or equally qualified non-African-American applicant.  A plaintiff "is required to establish that a successful applicant [was] not within his protected class."  Underwood, 431 F.3d at 794.  "[I]t is not necessary that [a plaintiff] name the individual hired by [the employer]," but the plaintiff must still

---

[19] Moreover, Barry avers that he never told plaintiff that he was ineligible to apply for a Yellow Transportation position until he had waited for six months, and states that he did not have an agreement with Elrod not to hire current or former Everklean representatives.  [Doc. 35-3 ¶ 71; Doc. 35-5 ¶ 8].

[20] Even if inquiring directly with Yellow Transportation managers had been an acceptable method of applying for a position, plaintiff still has not shown that he actually applied for a specific position for which he was qualified.  Additionally, although plaintiff claims that he did not make any further attempts to seek employment with Yellow Transportation because, in part, Elrod allegedly threatened to fire him and it would have been a "waste of time," [Doc. 35-3 ¶ 37; Doc. 38-2 at 33-34; Doc. 38-3 at 6], there is no indication that Yellow Transportation had anything to do with this alleged threat or otherwise prevented plaintiff from applying.

"present evidence that the favored applicant was [not in his protected class]." Id. (alteration added). Plaintiff cannot even identify a Yellow Transportation position that was open between December 2006 and January 2007 for which he both applied and was qualified, much less that an equally or lesser qualified applicant outside his protected class was hired over him. Furthermore, plaintiff has no knowledge of whether anyone was hired for any Yellow Transportation position at the Atlanta Facility between December 2006 and January 2007, and he is not aware of Yellow Transportation hiring an Everklean contractor any time. [Doc. 35-3 ¶¶ 34-36; Doc. 38-3 at 10-11, 36]. Plaintiff's unsupported argument that he was "denied a very valuable employment opportunity due to the preferential treatment of [Elrod] (non-African American) by the defendant(s) Yellow (YRCW) terminal local management," [Doc. 39 at 7 ¶ 9], simply does not meet his burden of establishing a *prima facie* case of discriminatory failure to hire, and his claims fail on this ground alone.[21] Thus, it

_____

[21] YRCW argues that even if plaintiff had satisfied his burden of establishing a *prima facie* case, he cannot overcome YRCW's legitimate, non-discriminatory reason for his alleged non-selection–plaintiff's failure to apply for a position–with evidence of pretext, specifically noting that plaintiff has failed to show that the alleged "six-month rule" cited by Elrod and Yellow Transportation managers existed or was actually applied to plaintiff. [Doc. 35-2 at 24-25]. In his response, plaintiff makes no reference to the "six-month rule," and he makes no other argument regarding pretext. Indeed, plaintiff has not cited any evidence to rebut YRCW's proffered reason for his non-selection, let alone evidence that reveals "such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions" that a "reasonable factfinder could find [the reason] unworthy of credence." Cooper v. S. Co., 390 F.3d 695, 725 (11th Cir. 2004) (quoting Combs, 106 F.3d at 1538), overruling on other grounds recognized by Andrews-Willmann v. Paulson, 287 Fed.

is **RECOMMENDED** that summary judgment be **GRANTED** on plaintiff's failure to hire claims against YRCW.

### c.    Plaintiff's Retaliation Claims

Plaintiff alleges that "in retaliation for . . . complaining about being addressed in a derogatory manner and being subjected to harassment because of his race, plaintiff was subjected to retaliation for opposing discriminatory treatment in the form of further harassment in the form of a locker search." [Doc. 1 ¶ 65]. However, summary judgment is likewise due to be granted on plaintiff's Title VII and § 1981 retaliation claims because he cannot establish a *prima facie* case. See [Doc. 35-2 at 17].

YRCW argues that plaintiff admitted at his deposition that he never complained to Yellow Transportation about derogatory comments or harassing conduct and admitted that he did not engage in protected activity, but that even if he had complained about the alleged comments or locker search, he has no evidence that these incidents were racially motivated, and his complaints therefore would not constitute statutorily protected activity. [Doc. 35-2 at 17]. Furthermore, YRCW asserts that plaintiff has not established that he suffered a materially adverse action based on the "locker search" and that he cannot establish a causal connection

---

App. 741 (11th Cir. 2008) (*per curiam*) (unpublished). Thus, YRCW's motion for summary judgment on plaintiff's failure to hire claims is due to be granted for this reason as well.

between any purported protected activity and the search of his belongings. [Id. at 17-19].

YRCW also argues that even if plaintiff were able to assert a *prima facie* case of retaliation based on the alleged locker search, his claim nonetheless fails because he cannot show that Yellow Transportation's articulated reason for conducting the search was pretextual. [Id. at 19-20]. Plaintiff's only assertions that could possibly relate to his retaliation claims are that "Barry . . . accepts responsibility for terminal cleaning and maintenance vendors . . ., but he did not attempt to investigate the complaint from the plaintiff and other African American contractors in reference to serious contract violations and hostile work environment," and that plaintiff has "suffered retaliation consequences for discussion [sic] issues of discrimination, hostile work environment and with soliciting for employment as a contractor or employee of defendant(s) Yellow (YRCW)." [Doc. 39 at 7-8 ¶ 10, & at 13 ¶ 10].

### i. *Prima Facie* Case

Title VII prohibits an employer from "discriminat[ing] against" an employee because the individual "opposed any practice" made unlawful by Title VII. See 42 U.S.C. § 2000e-3(a).[22] Where, as here, there is no direct evidence of retaliation, the

---

[22] Title VII also protects against retaliation against an employee "because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). Plaintiff has only alleged that he made internal complaints, which are ordinarily examined as protected activity under the "opposition" clause of Title VII's

Court evaluates a claim of retaliation in violation of Title VII by using the burden

shifting framework articulated in McDonnell Douglas, 411 U.S. 792; Burdine, 450

U.S. 248; and Hicks, 509 U.S. 502. See also Harris v. Fulton-DeKalb Hosp. Auth., 255

F. Supp. 2d 1347, 1360-61 (N.D. Ga. 2002). The plaintiff must therefore first establish

a *prima facie* case of retaliation. Berman v. Orkin Exterminating Co., 160 F.3d 697,

701 (11th Cir. 1998).

In order to establish a *prima facie* case of retaliation, plaintiff must show that

(1) he engaged in protected activity; (2) he suffered an adverse employment action;[23]

and (3) the adverse employment action was caused by his engaging in protected

activity. Hurlbert v. St. Mary's Health Care Sys., Inc., 439 F.3d 1286, 1297 (11th Cir.

2006); Meeks v. Computer Assocs. Int'l, 15 F.3d 1013, 1021 (11th Cir. 1994); Brochu

v. City of Riviera Beach, 304 F.3d 1144, 1155 (11th Cir. 2002); Sullivan v. Nat'l R.R.

Passenger Corp., 170 F.3d 1056, 1059 (11th Cir. 1999). YRCW maintains that plaintiff

cannot establish any elements of a *prima facie* case of retaliation. [Doc. 35-2 at 17-19].

_____

retaliation provision, not under the "participation" clause. See, e.g., EEOC v. Total
Sys. Servs., Inc., 221 F.3d 1171, 1174 & n.3 (11th Cir. 2000); Rollins v. Fla. Dep't of
Law Enforcement, 868 F.2d 397, 400 (11th Cir. 1989) (*per curiam*).

[23] "This element for a *prima facie* retaliation case generally has been referred
to as the adverse employment action element." McNorton v. Ga. Dep't of Transp.,
619 F. Supp. 2d 1360, 1374 n.7 (N.D. Ga. 2007) (citing Holifield, 115 F.3d at 1566).
However, in light of Burlington Northern & Santa Fe Railway Co. v. White, 548 U.S.
53 (2006), "it is more appropriate to refer to the 'adverse employment action'
element as the 'materially adverse action' element." McNorton, 619 F. Supp. 2d at
1374 n.7.

In order for an employee engaging in opposition activity to be protected under the anti-retaliation provision of Title VII, he must be opposing conduct that is made an "unlawful employment practice" by Title VII.[24] To meet this element, a plaintiff need only show that he "had a good faith, reasonable belief that the employer was engaged in unlawful employment practices." Little v. United Techs., Carrier Transicold Div., 103 F.3d 956, 960 (11th Cir. 1997). See also Lipphardt v. Durango Steakhouse of Brandon, Inc., 267 F.3d 1183, 1187 (11th Cir. 2001); Clover v. Total Sys. Servs., Inc., 176 F.3d 1346, 1351 (11th Cir. 1999). However, a plaintiff is charged with substantive knowledge of the law regarding unlawful practices. Harper v. Blockbuster Entm't Corp., 139 F.3d 1385, 1388 n.2 (11th Cir. 1998).

Construing the evidence in the light most favorable to plaintiff, there is no proof that plaintiff engaged in protected activity. Plaintiff alleges in his complaint that he was retaliated against for "complaining about being addressed in a derogatory manner and being subjected to harassment because of his race," [Doc. 1 ¶ 65], but he never complained to Yellow Transportation about derogatory

---

[24] Title VII defines an "unlawful employment practice" as, *inter alia*, discrimination against an employee "with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Likewise, § 1981 prohibits retaliation against an individual for opposing race discrimination. Andrews v. Lakeshore Rehab. Hosp., 140 F.3d 1405, 1412-13 (11th Cir. 1998); Tucker v. Talladega City Sch., 171 Fed. App. 289, 295-96 (11th Cir. 2006) (*per curiam*) (unpublished).

comments or harassing conduct, <u>see</u> [Doc. 35-3 ¶ 56; Doc. 38-3 at 41, 45-46], let alone opposed discrimination or retaliation on the basis of race, color, religion, sex, or national origin.[25]    To the extent plaintiff believes that he engaged in protected activity by complaining to Elrod, plaintiff has not shown that he had a reasonable basis to believe that such complaints constituted protected activity, since there is no evidence that the conduct of which he complained was based on a protected characteristic.

"[I]f an employee complains about discrimination, harassment, or retaliation that was motivated by something *other than* race, color, religion, sex, or national origin, that employee has not engaged in activity that is protected under Title VII." <u>Duncan v. Madison County</u>, No. 3:05-CV-93 (CDL), 2007 WL 2874803, at *7 (M.D. Ga. Sept. 27, 2007).   <u>See also</u> <u>Defrance v. CompuCredit Corp.</u>, Civil Action No. 1:06-CV-1491-TWT, 2007 WL 4373593, at *18-19 (N.D. Ga. Dec. 5, 2007) ("'In order to be protected activity, plaintiff must present evidence showing that [defendant] knew that her concern or complaints related in some way to race and a claim of being discriminated against on that basis.'") (<u>quoting</u> <u>Crumpton v. St. Vincent's Hosp.</u>, 963 F. Supp. 1104, 1119 (N.D. Ala. 1997)).   Plaintiff has not shown that he

_____

[25] Plaintiff testified that he complained to Yellow Transportation about being given "[c]onflicting reports" about the alleged "verbal agreement" regarding whether he could be hired, [Doc. 38-3 at 43, 46], but plaintiff gave no details about the nature of this complaint and has not shown it constituted protected activity under Title VII or § 1981.

engaged in protected activity and has therefore failed to establish the first prong of a *prima facie* case of retaliation. Summary judgment is due to be granted on his retaliation claims on this ground alone.[26] However, even if plaintiff could establish a *prima facie* case, his claims would still fail because he has not rebutted YRCW's legitimate, non-retaliatory reason for the action taken against him.

### ii. Legitimate, Non-retaliatory Reason and Pretext

YRCW asserts that even if plaintiff could establish a *prima facie* case of retaliation, he cannot show that Yellow Transportation's articulated reason for conducting the "locker search"–attempting to locate missing freight–was a pretext for retaliation. [Doc. 35-2 at 20]. YRCW has presented evidence that the "locker search" was conducted simply to search for missing freight, which satisfies YRCW's burden of articulating a legitimate, non-retaliatory reason for the challenged action. However, plaintiff has failed to show that YRCW's proffered reason is pretextual and in fact makes no argument regarding the alleged search, instead merely asserting that "Barry . . . accepts responsibility for terminal cleaning and maintenance vendors . . ., but he did not attempt to investigate the complaint from the plaintiff and other African American contractors in reference to serious contract violations and hostile work environment," and that plaintiff "suffered retaliation

---

[26] Having concluded that plaintiff failed to satisfy the first element of a *prima facie* case of retaliation, the Court need not address YRCW's arguments regarding the remaining elements.

consequences for discussion [sic] issues of discrimination, hostile work environment and with soliciting for employment as a contractor or employee of defendant(s) Yellow (YRCW)," [Doc. 39 at 7-8 ¶ 10, & at 13 ¶ 10].

Plaintiff acknowledges that freight was missing, and he has not identified any motive for Yellow Transportation conducting the search other than to find the missing freight; thus, he has not presented "significant probative evidence" of pretext, Mayfield v. Patterson Pump Co., 101 F.3d 1371, 1376 (11th Cir. 1996), and his conclusory statement, unsupported by evidence, that he has "suffered retaliation consequences for discussion [sic] issues of discrimination, hostile work environment and with soliciting for employment" [Doc. 39 at 13], fails to create any issue of fact as to whether YRCW's reason for the search was pretextual. See Wallace v. Teledyne Continental Motors, 138 Fed. App. 139, 143 (11th Cir. 2005) (*per curiam*) (unpublished) (plaintiff's belief that she was qualified for position was based solely on her subjective, conclusory testimony, which was insufficient to create genuine issue of material fact as to whether plaintiff established *prima facie* case or rebutted defendant's legitimate reason as pretextual) (citing Grigsby v. Reynolds Metals Co., 821 F.2d 590, 597 (11th Cir. 1987) ("stating that plaintiff's conclusory allegations not sufficient to raise inference of pretext or discrimination where employer offers extensive evidence of legitimate, nondiscriminatory reasons for its acts")).

In evaluating pretext, "the focus is on the employer's beliefs rather than the employee's own perceptions," <u>Lockett v. Choice Hotels Int'l, Inc.</u>, 315 Fed. App. 862, 868-69 (11th Cir. 2009) (*per curiam*) (unpublished), and plaintiff presents no evidence that YRCW's stated reason for conducting the search was so inconsistent, implausible, incoherent, or contradictory that it is unworthy of belief, <u>Combs</u>, 106 F.3d at 1538. Moreover, plaintiff has offered no evidence creating a genuine issue of fact as to whether any protected activity he engaged in was the real reason for the search. <u>See</u> <u>Hicks</u>, 509 U.S. at 507; <u>Burdine</u>, 450 U.S. at 25; <u>Perry v. Ala. Dep't of Corr.</u>, 130 Fed. App. 399, 405 (11th Cir. 2005) (*per curiam*) (unpublished). Accordingly, even if plaintiff had established a *prima facie* case, since he has failed to demonstrate any genuine issue of material fact that the reason given for the action taken against him was pretextual, it is **RECOMMENDED** that summary judgment be **GRANTED** on plaintiff's retaliation claims against YRCW.

### d.      Plaintiff's Hostile Work Environment Claims

To the extent plaintiff's complaint may be construed as stating racially hostile work environment claims against YRCW under Title VII or § 1981, YRCW is entitled to summary judgment. YRCW contends that plaintiff's claims are based primarily "on just two isolated comments that were not on their face motivated by his race," as well as on the "locker search," which YRCW argues was not severe or pervasive enough to rise to the level of a hostile work environment and has not been shown

to be racially motivated. [Doc. 35-2 at 9-14]. Plaintiff has not responded to this argument except to make the unsupported statement that Yellow Transportation "allow[ed] [Elrod] to willingly create a hostile work environment," which "violates EEOC policy and the plaintiff's rights under [Title VII]." [Doc. 39 at 10 ¶ 5].

In order to state a *prima facie* case of a hostile work environment based on race, plaintiff must show: (1) that he belongs to a protected group, (2) that he was subjected to unwelcome racial harassment, (3) that the harassment was based on his race, (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment, and (5) that there is a basis for holding YRCW liable. Harper v. ULTA Salon Cosmetics & Fragrance, Inc., Civil Action File No. 1:05-CV-1285-TWT, 2007 WL 528088, at *25 (N.D. Ga. Feb. 13, 2007), adopted at *1 (citations omitted). See also Moore, 520 F. Supp. 2d at 1369 ("The elements of a racially hostile work environment claim are the same, regardless of whether the claim is viewed through the lens of Title VII or § 1981."). Thus, plaintiff must demonstrate that his workplace was "permeated with discriminatory intimidation, ridicule, and insult," that was "sufficiently severe or pervasive" to have altered the terms, conditions, or privileges of [his] employment. Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) (internal marks and citation omitted); Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1275 (11th Cir. 2002); Gupta v. Fla. Bd. of Regents, 212 F.3d 571, 582-83 (11th Cir. 2000),

abrogated on other grounds as recognized by Crawford v. Carroll, 529 F.3d 961, 974 (11th Cir. 2008). That is, he must prove that, among other things, he was harassed because of his race and that the harassment affected the terms, conditions, or privileges of his employment. Miller, 277 F.3d at 1275.

Plaintiff alleges that he experienced a hostile work environment because "Ted," a Yellow Transportation supervisor, commented on one occasion that plaintiff was "running around like a crack head" and referred to plaintiff as a "clean up guy," which resulted in plaintiff "having words" with Ted, and on another occasion, plaintiff was referred to in a "derogatory" way by dock workers, and plaintiff was subjected to the "locker search" that he claims invaded his privacy. See [Doc. 35-3 ¶¶ 50-52, 55; Doc. 1 ¶ 64; Doc. 38-3 at 36-42]. While plaintiff clearly belongs to a protected class, and the Court has no doubt that he did not welcome any alleged racial harassment, he has failed to show that the alleged harassment was based on his race or that it was sufficiently severe or pervasive to alter the terms and conditions of his employment (or contractual working relationship).

"Before allegedly harassing statements and conduct can be considered in determining whether the severe or pervasive requirement is met, such statements and conduct must be shown to have been based upon race." Whitner v. Emory Univ., Civil Action File No. 1:06-CV-1518-TWT, 2008 WL 4224407, at *25 (N.D. Ga. Sept. 12, 2008), adopted at *1. Therefore, "[i]nnocuous statements or conduct, or

boorish ones that do not relate to the [race] of the actor or of the offended party [ ], are not counted." Id. (internal marks and citations omitted) (alteration in original).

Here, the record does not support an inference that race motivated any of the statements or incidents at issue. Indeed, plaintiff has "failed to demonstrate, or even argue, that any of the alleged harassment was related to [his] race." Givens v. Chambers, 548 F. Supp. 2d 1259, 1278 (M.D. Ala. 2008). See also Carrio v. Apollo Group, Civil Action File No. 1:07-CV-1814-BBM, 2009 WL 2460983, at *18 n.20 (N.D. Ga. Aug. 7, 2009), adopted at *6. The terms "crack head" and "clean up guy," while offensive, are not inherently racial. Plaintiff even testified that he may have been referred to as a "crack head" because he looked "rough" from working very hard. [Doc. 35-3 ¶ 53; Doc. 38-3 at 42]. Likewise, the unspecified "derogatory" comments by Yellow Transportation dock workers were apparently so innocuous that plaintiff does not recall any details about them and never reported them. [Doc. 35-3 ¶ 55; Doc. 38-3 at 41-42, 46]. With regard to the "locker search," plaintiff does not know why the search was conducted, other than to search for missing freight, and he has no knowledge of whether other Everklean or Yellow Transportation workers' belongings were searched, or whether he was singled out in any way because of his race. [Doc. 35-3 ¶¶ 62, 65-66; Doc. 38-3 at 43-49, 53, 56].

"[W]here there is no evidence that an allegedly hostile work environment was motivated by a plaintiff's race, the claim must be dismissed." Smalls v. Allstate Ins.

Co., 396 F. Supp. 2d 364, 372 (S.D.N.Y. 2005). Accordingly, none of these allegations support plaintiff's claim that he suffered a racially hostile work environment. See Uddin v. Univ. Avionics Sys. Corp., No. 1:05-CV-1115-TWT, 2006 WL 1835291, at *4 & n.1 (N.D. Ga. June 30, 2006), adopted at *1 (citing Gupta, 212 F.3d at 583); Baker v. City of Safe Harbor, Fla., No. 8:07-cv-1120-T-23TGW, 2008 WL 4200147, at *16 (M.D. Fla. Sept. 12, 2008), adopted at *1 (citing Baldwin v. Blue Cross/Blue Shield of Ala., 480 F.3d 1287, 1301-02 (11th Cir. 2007)). See also Apodaca v. Sec'y of the Dep't of Homeland Sec., 161 Fed. App. 897, 901-02 (11th Cir. 2006) (per curiam) (unpublished) (finding that plaintiff "fail[ed] to establish a prima facie case for a pervasive hostile work environment because he provides no evidence that any of his allegations were based on race").

Even if plaintiff could show that these incidents were based on his race, summary judgment would still be warranted because he has failed to show that the harassment was so severe or pervasive that it altered the conditions of the workplace, creating an objectively abusive and hostile atmosphere. Harris, 510 U.S. at 21; Gupta, 212 F.3d at 582-83. Plaintiff must establish not only that he subjectively perceived the work environment to be hostile, but also that a reasonable person in his circumstances would perceive it to be so. Gupta, 212 F.3d at 583. In making this determination, the Court considers four factors: the frequency of the allegedly discriminatory conduct; the severity of the conduct; whether the conduct was

threatening or humiliating; and whether it unreasonably interfered with the plaintiff's performance at work. <u>Harris</u>, 510 U.S. at 23; <u>Gupta</u>, 212 F.3d at 584; <u>Mendoza v. Borden, Inc.</u>, 195 F.3d 1238, 1246 (11th Cir. 1999). Proof is not required on each factor individually; the Court employs a totality of the circumstances approach. <u>Hulsey v. Pride Rests., LLC</u>, 367 F.3d 1238, 1248 (11th Cir. 2004).

Plaintiff fails to provide any details regarding the allegedly derogatory statements Yellow Transportation workers made to him, including who made the comments, when they were made, or the circumstances surrounding them, [Doc. 35-3 ¶ 55; Doc. 38-3 at 41-42, 46], and he admits that he "brushed off" the comments because "that's just them," [Doc. 35-3 ¶ 55; Doc. 35-3 at 42]. Likewise, plaintiff cannot remember when Ted made the alleged "crack head" and "clean up guy" comments but admits that it was an isolated incident and that he was not referred to as a "crack head" again by Ted or anyone else. [Doc. 35-3 ¶ 54; Doc. 38-3 at 37]. Plaintiff's only evidence regarding the locker search is that the security guard searched his bag containing "personal belongings," such as his CD player, phone, and food, which does not rise to the level of severity necessary to sustain a hostile work environment claim. [Doc. 35-3 ¶ 64; Doc. 38-3 at 50-51]. Furthermore, plaintiff did not suffer any disciplinary actions or consequences as a result of any of these incidents, other than Elrod purportedly telling him to "leave it alone" with regard to the search of his bag. [Doc. 35-3 ¶ 67; Doc. 38-3 at 51-52].

The actions complained of by plaintiff, individually and in their totality, "constitute[] the kind of ordinary tribulations of the workplace" that are not actionable. <u>Whitner</u>, 2008 WL 4224407, at *26. Indeed, "[t]his is not a situation where 'the workplace is permeated with discriminatory intimidation, ridicule, and insult.'" <u>Reeves v. DSI Sec. Servs., Inc.</u>, Civil Action No. 2:08cv602-WHA, 2009 WL 2738629, at *7 (M.D. Ala. Aug. 27, 2009), adopted at *1 (<u>quoting</u> <u>Butler v. Ala. Dep't of Transp.</u>, 536 F.3d 1209, 1214 (11th Cir. 2008)). Plaintiff has failed to present any evidence that the harassment at issue was so severe or pervasive that it altered the conditions of his workplace, <u>Hudson v. Norfolk S. Ry. Co.</u>, 209 F. Supp. 2d 1301, 1325 (N.D. Ga. 2001), and he "has not come forward with any evidence to show that any acts occurred with any sort of regularity or were more than a few isolated incidents," <u>Anderson v. Dunbar Armored, Inc.</u>, Civil Action File No. 1:08-CV-3639-BBM, 2009 WL 2568062, at *29 (N.D. Ga. Aug. 18, 2009), adopted at *1 (internal marks and citation omitted). Because plaintiff has presented evidence only of very isolated incidents of alleged harassment, he has not shown that the incidents amounted to the "extreme" level of discriminatory conduct required for an actionable hostile work environment claim. <u>Godoy v. Habersham County</u>, 211 Fed. App. 850, 854 (11th Cir. 2006) (<i>per curiam</i>) (unpublished); <u>Reeves</u>, 2009 WL 2738629,

at *7.[27] Accordingly, it is **RECOMMENDED** that summary judgment be granted on plaintiff's hostile work environment claims.

### e. YRCW's Failure to "Police" Plaintiff's Employment Status

Plaintiff also claims that Yellow Transportation discriminated against him on the basis of race in that it should have "seen that [Elrod] was supposed to have employees and not independent contractors" under Everklean's contract with U.S. Maintenance, and that Yellow Transportation should have "remedied the situation." [Doc. 35-3 ¶ 68; Doc. 38-4 at 9-10]. Plaintiff claims that all African-American contractors felt as if they were wrongfully not being treated as employees by Elrod. [Doc. 35-3 ¶ 68; Doc. 38-4 at 13, 22-23].

---

[27] Plaintiff's claims also fail because he admits that he never complained to Yellow Transportation about the alleged harassment. The Eleventh Circuit has held that "an employer is not liable for a hostile work environment unless the plaintiff shows that the employer 'had notice of the alleged harassment and failed to take immediate and appropriate corrective action.'" Muggleton v. Univar USA, Inc., 249 Fed. App. 160, 163 (11th Cir. 2007) (*per curiam*) (unpublished) (quoting Watson v. Blue Circle, Inc., 324 F.3d 1252, 1257 (11th Cir. 2003)). Plaintiff's complaint states that the "locker search" was done in retaliation for complaining to Yellow Transportation about being addressed in a derogatory manner and being subjected to harassment because of his race. [Doc. 1 ¶ 65]. However, while he complained to Elrod about the "locker search," there is no evidence that plaintiff reported this incident to Yellow Transportation management. [Doc. 35-3 ¶¶ 56-57, 67; Doc. 38-3 at 51-52]. Likewise, plaintiff never reported the alleged "crack head" and "clean up guy" comments to anyone at Yellow Transportation, and there is no evidence that he complained about the unspecified comments by dock workers, since he simply "brushed" them off. [Doc. 35-3 ¶¶ 55-57; Doc. 38-3 at 41-42, 45-46].

YRCW argues that plaintiff "has not and cannot establish that Yellow Transportation had any obligation to police the contractual relationship between [Everklean] and U.S. Maintenance–two unrelated business entities," and that even if Yellow Transportation somehow did have such an obligation, "the gravamen of any discrimination claim is a showing that similarly situated employees outside the protected class received more favorable treatment," and that plaintiff has admitted he cannot identify any white person who was treated more favorably by Yellow Transportation–"including any white person who Yellow Transportation forced [Everklean] to treat as an employee." [Doc. 35-2 at 27; Doc. 35-3 ¶ 70; Doc. 35-6 at 18-19]. Furthermore, plaintiff admits that at least one white Everklean independent contractor worked at the Atlanta Facility. [Doc. 35-3 ¶ 69; Doc. 38-4 at 24]. YRCW further argues that plaintiff's claim that Yellow Transportation discriminated against him by not forcing Everklean to treat him as an employee in mid-December 2006 is "completely undermined by his admission that he refused employment by Everklean less than one month later." [Doc. 35-2 at 27].

Plaintiff understood that he was retained by Everklean as an independent contractor rather than as an employee, but he came to believe that under Everklean's contract with U.S. Maintenance, Elrod was required to treat him and other Everklean independent contractors as employees, which he discussed with Barry in December

2006.  [Doc. 35-3 ¶¶ 22, 25-27; Doc. 38 at 50-51, 65-67; Doc. 38-2 at 54-55].  On December 23, 2006, Elrod sent a letter on behalf of Everklean to Everklean contractors, including plaintiff, informing them that as of January 1, 2007, all Everklean contractors would become Everklean employees.  [Doc. 35-3 ¶ 40; Doc. 38-2 at 66-67; Doc. 38-7 at 45].  Plaintiff received this letter and understood that he would be an Everklean employee as of January 1, but when Elrod requested that plaintiff fill out an I-9 form on January 4, 2007, plaintiff refused because he believed it to be incorrect and "didn't want to be an employee under [Elrod]."  [Doc. 35-3 ¶¶ 41-43; Doc. 38 at 71, 75-76; Doc. 38-2 at 67, 75-76].  Plaintiff never returned to Everklean, although he claims that Elrod told him that his position was "eliminated" because he did not complete the form.  [Doc. 35-3 ¶¶ 44-45; Doc. 38 at 72, 76].

As noted earlier, YRCW does not dispute that Everlean was required to have employees, as opposed to independent contractors, under its contract with U.S. Maintenance, [Doc. 35-2 at 26 n.9], and the copy of U.S. Maintenance's subcontractor agreement plaintiff attached to his response indicates that Everklean was, in fact, required to treat its independent contractors as employees.  See [Doc. 39 at 38]. However, the Court agrees with YRCW that there is no genuine issue of material fact that Yellow Transportation's conduct or role with regard to plaintiff's contractual status did not violate Title VII or § 1981.

Plaintiff states in conclusory fashion that "Barry . . . accept[ed] responsibility for terminal cleaning and maintenance vendors (i.e. cleaning contract), but he did not attempt to investigate the complaint from the plaintiff and other African American contractors in reference to serious violations and hostile work environment," that plaintiff reported allegations against Elrod to Barry and "other members of Yellow . . . Atlanta terminal management in an attempt to help the plaintiff adjust his status of employment," that "Barry . . . has stated he is responsible for insuring that legal obligations for the Atlanta terminal cleaning contract [sic], but did not look into issues alleged by the plaintiff," and that "[t]he defendant(s) at Yellow . . . local terminal did nothing to minimize damage to the plaintiff when it was discovered his services were being illegally contracted." [Doc. 39 at 7-8 ¶ 10, 9 ¶ 4, 11 ¶ 2, 12 ¶ 5]. However, plaintiff does not cite any evidence supporting these allegations and has failed to show that YRCW was required by any federal or state law to police the contract between Elrod and U.S. Maintenance or ensure that Elrod treated plaintiff as an employee rather than an independent contractor. Furthermore, plaintiff makes no showing as to how YRCW's alleged conduct violated Title VII or § 1981. Thus, to the extent plaintiff has asserted distinct claims regarding YRCW's "duty" to require Everklean to treat plaintiff as an

employee, which Elrod was prepared to do as of January 1, 2007, the undersigned **RECOMMENDS** that summary judgment be **GRANTED** on these claims.

**B.    Failure to Serve Defendants U.S. Maintenance, Everklean, and Elrod**

Plaintiff has failed to effect service of process upon defendants U.S. Maintenance, Everklean, and Elrod. Rule 4(c) of the Federal Rules of Civil Procedure requires that a summons be served with a copy of the complaint. Fed. R. Civ. P. 4(c)(1). Unless a plaintiff requests and obtains a waiver of service from the defendant(s), the plaintiff must show proof of service. <u>See</u> Fed. R. Civ. P. 4(d)(1), (4). Furthermore, Federal Rule of Civil Procedure 4(m) provides in pertinent part:

> If a defendant is not served within 120 days after the complaint is filed, the court--on motion or on its own after notice to the plaintiff-- must dismiss the action without prejudice against that defendant or order that service be made within a specified time. But if the plaintiff shows good cause for the failure, the court must extend the time for service for an appropriate period.

Fed. R. Civ. P. 4(m). In addition, Local Rule 41.2B provides that this Court may, "with notice to the party on whose behalf service was required, dismiss a case without prejudice as to any defendant not served within 120 days after the filing of the complaint." Local R. 41.2B, N.D. Ga.

Here, plaintiff did not obtain waivers of service from U.S. Maintenance, Everklean, or Elrod, and he was therefore required to serve each of them.[28] Plaintiff understood that he was required to properly serve these defendants, evidenced by his letters to Judge Go requesting additional time to serve U.S. Maintenance and inquiring as to whether he had properly served Elrod, as well as the docket entry for Judge Go's November 13, 2008, status conference, which indicates that plaintiff was given until December 19 to serve the remaining defendants. [Docs. 13 & 14; Docket entry 11/13/08]. Furthermore, plaintiff requested another extension in his December 29, 2008, letter, and Judge Vitaliano's transfer order directed plaintiff to serve the defendants in accordance with the Federal Rules of Civil Procedure and the local rules of the Northern District of Georgia. [Docs. 19 & 20]. However, despite his awareness of his obligations to perfect service of process, plaintiff's case has been pending in this Court for nearly a year, and the record reflects that he has yet to serve the complaint on defendants U.S. Maintenance, Everklean, and Elrod.

Plaintiff was given multiple extensions of time in which to effectuate service and was given one more chance to perfect service once the case was transferred to

---

[28] Plaintiff stated in his September 30, 2008, letter that "[p]roper service was made to [Everklean/Elrod]," and that Elrod "did receive and sign confirmation for the waiver." [Doc. 13]. However, the waiver of service was not filed with the court, and the docket entry for the November 13 status conference indicates that plaintiff had yet to serve Everklean and Elrod.

the Northern District of Georgia, despite already exceeding the 120-day limit while the case was pending in the Eastern District of New York. These circumstances merit dismissal as to U.S. Maintenance, Elrod, and Everklean, notwithstanding plaintiff's *pro se* status. <u>See</u> Fed. R. Civ. P. 4(m); Local R. 41.2B, N.D. Ga.; <u>Dyer v. Wal-Mart Stores, Inc.</u>, 318 Fed. App. 843, 844 (11th Cir. 2009) (*per curiam*) (unpublished); <u>Stephens v. Ga. Dep't of Transp.</u>, Civil Action File No. 5:08-CV-219-CAR, 2009 WL 3747167, at *2 (M.D. Ga. Nov. 4, 2009). Therefore, it is **RECOMMENDED** that plaintiff's claims as to U.S. Maintenance, Elrod, and Everkleen be **DISMISSED** for failure to effect service of process.

This Report and Recommendation ("R&R") serves as notice to plaintiff that if he disagrees with this recommendation, he "must file timely objections to the R&R with the District Court, setting forth appropriate evidence and arguments why [his] failure to serve [the remaining defendants] should not result in the dismissal of [his] claims against [them]." <u>Anderson</u>, 2009 WL 2568062, at *8 (<u>citing</u> <u>United States v. Willis</u>, 273 F.3d 592, 597 n.6 (5th Cir. 2001) ("We note here that these two concerns [of notice and an opportunity to be heard] were satisfied due to the fact that the magistrate raised the issue and Willis then had an opportunity to argue against the magistrate's findings to the district court.") (internal marks omitted) & <u>O'Conner v. McNeil</u>, No. 07-60636-CIV, 2008 WL 762651, at *3 (S.D. Fla. Mar. 20, 2008),

adopted at *1 (R & R places petitioner on notice to object to magistrate judge's *sua sponte* recommendation of dismissal of habeas petition as untimely filed)).

### III.  <u>CONCLUSION</u>

For the foregoing reasons and cited authority, the undersigned **RECOMMENDS** that YRCW's motion for summary judgment, [Doc. 35], be **GRANTED**, and that this case be **DISMISSED** as to defendants U.S. Maintenance, Everklean, and Elrod for failure to effect service of process.

The Clerk is **DIRECTED** to remove Yellow Transportation, Inc., as a defendant from the docket and to terminate the referral to the undersigned.

**IT IS SO ORDERED AND RECOMMENDED**, this 22nd day of January, 2010.

_Russell G. Vineyard_
RUSSELL G. VINEYARD
UNITED STATES MAGISTRATE JUDGE